The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Eugene G. Daugherty presiding. Good morning all. Court is calling case number 4-220754, People v. David Michael Boswell. I'm just going to note for the benefit of counsel that due to some technical issues, Justice DeArmond's chambers, he's appearing by phone today, although he can't see you or you can't see him, he is able to hear and communicate with us orally. Would counsel for the appellate please state your name for the record? My name is Tomas Gonzalez from the State Appellate Defender's Office. For the appellant, David Boswell. And for the appellee? Luke McNeil. All right, appellant may proceed. Thank you, your honors. May it please the court, counsel? David Boswell is sufficiently established by preponderance of the evidence that he was denied his right to conflict-free counsel where the Chief Public Defender's Office under former Chief Kim Campbell operated under a per se conflict of interest or alternatively, where APD Barnes operated under an actual conflict of interest. I'm going to address the actual conflict briefly first, your honors. So this actual conflict on the part of Barnes, in this court's previous opinion, it had recognized that Boswell explicitly found that the statements, or the previous opinion explicitly found that the statements in McBride's affidavit support the inference that Barnes did labor under actual conflict of interest by not reporting Campbell's conduct to the trial court in a post-trial motion. This inference was- Mr. Gonzalez, before we leave that point, that was a finding based on only pleadings, right? That is correct. And what the court gave your client was the right to a hearing. Now we have not just what was said in the pleadings. We have a full record. We've heard from Barnes. So that's our rear view mirror, right? That finding, we have to look at the evidence that was adduced at the hearing. Very true. But the next point I wanted to make was that this inference now was proven as a matter of fact. It wasn't rebutted at the evidentiary hearing. In fact, it was supported by McBride's testimony, which was consistent with her affidavit from 2014. It is now undisputed, even after the evidentiary hearing, that soon after the verdict, but before the post-trial motion, investigator McBride told Barnes about Campbell's comment that she aided and foisted with a closing argument. And in fact, taking it even further, Barnes conceded in her civil deposition and in her own affidavit that this comment was reported to her and that she did not bring it to the trial court's attention. Her explanation for that was that she simply didn't believe it to be true. However- I guess that would depend more or less on the information. And as this court has recognized, again, albeit in a different stage of the proceedings, a comment and an allegation like this, it's not her decision. Her subjective belief really isn't the issue. It's whether or not she had a duty, which this court previously found that she did, to bring this to the trial and let the trial court decide. Has that now through a different route happened? The trial court has had a hearing. The trial court investigated it. The trial court, as a matter of fact, found that's not really how it happened. Well, we submit that that's just not- that doesn't speak to the actual conflict in 2011. I mean, for one, it's justice delayed, justice denied. And number two, they had to say that somehow this evidentiary hearing long after the fact, 11 years later, somehow absorbed or undoes the actual conflict, which the only thing that needs to be shown for the actual conflict is this manifestation or this evidence of a decision making on the part of Campbell that's attributed to her dividing loyalties. And Boswell- On the part of Campbell or Barnes? I'm sorry. I'm sorry. On the part of Barnes, I misspoke. On the part of Barnes. Yes. And that doesn't change the fact that an evidentiary hearing was held 11 years later. Again, aside from the justice delayed, justice denied, this was something that should have been brought to the attention and litigated in 2011, not 11 years later. So we just submit that that's not really relevant and that shouldn't inform the ultimate decision as to whether or not an actual conflict was shown because really at the end of the day, what matters was what counsel Barnes decided to do or not do because of her divided loyalty at that time in 2011. So counsel, what import is it that when the evidentiary hearing occurred, virtually all these players, in a sense, testify that they didn't believe McBride? I don't recall. I believe- Or didn't believe the allegation. Didn't believe the allegation in its totality. Just didn't believe that that was the case. I don't think. I think that it's not quite that strong. I think Barnes was the only one who explicitly said, I just didn't believe it to be true. That's why I didn't report it. McOdony just wasn't privy and he just wasn't aware of it. He, of course, McOdony, who was the other assistant public defender, testified that, number one, had he heard it, yes, it was obviously disturbing. And he testified to do two different things. One, he said, well, I don't know what I would have done because, you know, I'm in an awkward position. She's my supervisor. And multiple witnesses, of course, testified to Campbell's supervisory role and, you know, what role that might have played. And he testified that, yeah, it should have been brought to the court's attention. But again, he wasn't privy to it. So he wasn't in a position and nor did he, in fact, testify to, I believe, that he didn't believe McBride. So McBride, and just speaking about the remark itself, the only one who testified that she didn't believe it to be true was Barnes. Well, what about the procedure of serve rebuttal? And it's really, this theory of McBride is not consistent with how trial lawyers prepare and perform rebuttal argument in jury trial. How does that play into your thinking? Yeah, that is a little unusual. I would certainly concede that. But I think at the end of the day and the testimony or the evidence was that, basically, from start to finish, from the public defender's opening statements, through their questioning at trial, through their challenging of the witnesses, really, the issue was pretty straightforward. It was basically calling into question the eyewitnesses' identification based on his various vantage points when he called the police and the question of whether or not, you know, who the driver was. Was the driver Boswell or was it his co-defendant? I believe it was Trimmy. But that was essentially it. Those were the two defense theories. So defense counsel, I think, argued that, well, OK, even if you believe that there was no time for discussion, OK, it's not hard to assist when you know what that defense theory is from the opening statements all the way through the trial itself. And that, you know, it's pretty evident what needs to be addressed in the rebuttal argument. Except no one involved in that says it happened. And tell me what your reaction to this is, counsel. It strikes me that this is possibly all built on the investigator taking a statement more literally than it was intended to be. I know a local attorney in my meeting here, other lawyers in this firm ask the same questions, make the same arguments in closing argument. He taught them, but he didn't write that. And I feel as though stating that, you know, I could have written that or I wrote that. Isn't that like teaching somebody that, you know, this is how this is done? I fear that the whole thing is built on taking that statement more literally than it was intended. Well, I would certainly concede, Your Honors, that as it pertains to the actual conflict or I'm sorry, the per se conflict, that that is a weaker point. I will grant you that. And like Justice Kavanaugh pointed out, the unusual scenario of, you know, when we're dealing with a rebuttal argument as opposed to, for example, like an opening argument. All right. But if Your Honors don't feel that that's enough, I think the more disturbing evidence, now if I can shift to a per se conflict, because in part hopefully answers your question. But that's not all we have for the per se conflict. We have that, so that everything we're talking about with respect to whether or not McBride is believable as to whether or not Campbell actually foster. Okay. That goes more towards the actively aiding that this court addressed at the pleading stage. Which I agree. If that happened, it would be very concerning. We were concerned enough about it to remand it for the hearing. I feel as though we should be relieved at the outcome. Yeah. I mean, I won't belabor that other than to say, and I do outline it in my brief, but just to expand on it a little bit here, that I just, I think that McBride was very consistent in her story. And I know this is separate apart from how she perceived it and all of that, but I mean, she was very consistent and adamant about what she heard and what she believed and told the same, gave the same account since 2014. And I would note too that that first affidavit that was prepared in 2014 was done pursuant to an investigation by Judge Robb. And Judge Robb is the one who actually prepared the affidavit. So it's not like she just kind of pulled this out of thin air or just was making this up or was sharing stories over the years. It just seems like it was a misinterpreted statement. Okay. And yeah. And of course, and that's disputed and that was disputed below, but what wasn't disputed and what I'm going to kind of shift to is the other troubling part of the per se conflict. Because aside from whether or not Barnes or whether or not Campbell actively aided Foster is this contemporaneous association. Was it contemporaneous? Well, contemporaneous, my understanding of the dictionary is meaning about, okay, first of all, the case law doesn't require that I'm aware of like a strict order of sequence events contemporaneous meaning around the time of trial, whether, and this didn't happen in a vacuum. This didn't happen in a vacuum. And I, when I was looking at the testimony more closely about there was, there was even Campbell herself. And I believe Campbell herself, and I can't remember if it was one other witness, but there was definitely evidence at the evidentiary hearing that around the time when Basler was being tried, Yoder, who was the state's attorney at the time, was nearing the end of his term. And that it was known that ASA Foster was going to seek his office because apparently Yoder had been seeking a judgeship for a little bit of time. So, and then the one witness that there, there was a two public defender witnesses who testified that sometime, I think one of them tried to narrow it down to the fall of 2011. Well, that's, that's when Basler was tried. He was tried in August of 2011. He was sentenced in October of 2011. So Basler would submit to your honors that this, this was definitely contemporaneous. But I mean, anything that happens later, it can't be an influence. Well, but it shows, and I'm going to kind of piggyback this a little bit. I would submit as far as some of the subsequent conduct and whether it's the day after, whether it's October 8th, 2011 or November of 2011, or even the stuff that the court accepted by way of proffer and by way of exhibits and by way of evidence about the 2013 stuff. I mean, I would also venture to say and submit on behalf of Basler that that also shows a pattern of that she had just, that she had very good reason to believe the statement that Campbell had made about aiding Foster. But getting back to the point about the association and the election again, 2011, it's still, it's not like the, the, the election just happened in a vacuum or that, you know, she did testify, Campbell did, that it was known that her good friend or a good personal, and with whom she maintained a close personal and professional relationship. Which happens, happens a lot. It does, it does. And I, you know, I, I practice in Cook County in Chicago, and I know that it's a lot bigger up here, but yeah, I mean, even at any jurisdiction, yeah, I understand it happens. But this is, this is more than usual. I would submit that just, this doesn't happen. Like, this is just beyond what we ordinarily see in conflict cases. But in, in our conflict rules, we know that if somebody, you know, the, the, in the PD's office, especially, it's not treated like a private law firm. And the evidence seemed to be that she was screened from this case. Well, that's, that's what she said at one point. And that's what McEldowney said. True. But Campbell also said that notwithstanding that, I still had supervisory authority over the entire staff, including these public defenders who represented Boswell. Of course she did. That's by definition, if she's the head public defender, the same way that if she were state's attorney, she would have a leadership role there. But don't we have to look at whether it was exercised in a way that reflected some influence? Well, a couple of things. And again, with the understanding, of course, that Your Honor spoke at a different stage of the proceedings, but speaking again, a couple of factors. One is the highly unusual nature of this kind of conduct, given the supervisory authority that she still held. And I still think it's highly important that she admitted she didn't really, like she was still, not only was she still supervising, she felt compelled to attend the rebuttal closing argument. She wasn't sure, she claimed she was foggy about whether or not she attended the opening argument, whether or not she saw the defense, but she was there for Foster's rebuttal closing argument. And she even admitted that she felt, quote, unquote, conflicted. While watching her and after watching her, she felt on the one hand proud, and yeah, there's my mentor, my mentee, even though she, of course, she testified more. But again, normal human reaction, you know, there's the person I trained, but my office's case is being harmed. That's a conflicting thing. But go to the bottom of it. She's screened from the case. What difference does it make? That's why she was screened from the case. Well, she was screened from the case, she said, because of the fact that she was first assistant state's attorney at the time Basel was charged. True. It wasn't based on any of this election stuff. And I want to really zero in on this, because I think this is, number one, it just wasn't disputed. Okay, and we can discuss, what contemporaneous means and the exact dates. And I will concede that the record doesn't give that definitive date beyond sometime in 2011, and as best as I can tell, the fall of 2011. But again, it's not like this just all happens in a vacuum. And whether or not she removed herself from the case, because she was first assistant at the time Basel was charged, that doesn't speak to what she chose to do. And I think, most significantly and disturbingly, using public defender resources and employees, and employees themselves testifying that they felt pressured by her. Sasha Jennings in particular. How is that an issue in this case? I hear what you're saying. How is that an issue in an appeal from a criminal conviction proceeding? It establishes the court's entitled to consider and should have considered in the broader claim, in the broader claim of whether- But that was all there for the trial court to consider. Don't we afford the trial court discretion in its rulings? Isn't it a manifest weight standard on his findings? You mean the post-conviction court, the election stuff? Yeah, certainly the standard review is but manifest error amounts to... And in this case, we certainly submit that it was shown, because all that means is, was this error clearly evident? Was it plain? Was it indisputable? Well, certainly what was indisputable was that Campbell assist during or around the time of Basel's trial, assisted Foster, one of the prosecutors in her campaign for state's attorney. And the fact that the court didn't even touch it. The court just ignored it. The court just blew it off. They didn't even just focused on the narrow question that was disputed. And that's the active participation in whether or not Campbell helped Foster write the argument, but completely ignore this other stuff. And to your question about how is that relevant on this appeal? Well, again, because it shows the contemporaneous association, which is all... Yeah, it's a different manifestation, but it's still part of the general question as to whether or not a per se conflict was established. Do we also have to consider the contemporaneous relationship between the investigator and his other people? And the reason I ask, and I want you to think about this and answer, is because you've talked about a highly unusual situation. Isn't it highly unusual for a defense investigator to solicit this kind of a comment out of an inquiry trial? Isn't it highly unusual for a defense investigator not to understand how Sir Rebuttal is prepared and executed? So don't we have to stop and consider the actions of the investigator as well, the same investigator who pursued these allegations for such a length of time? Let me try to keep it straight in my mind and try to answer it. Because from the framing of your question, I think the concern is that somehow what McBride did was highly unusual herself. And that maybe suspicious is too strong a word, but certainly unusual. Well, in the jury trial context, which I have a little bit of experience in, I would call this scenario highly unusual. And if you've got experience in the jury trial racket, I would have the same suspicions. Yeah, and I confess, I certainly do not have jury trial experience. You're out of time, but you can answer the question, counsel. Okay, let me just try to do as briefly as I can. Being an investigator, first of all, McEldowney vouched for her integrity, for her skills, for her honest and her history, her unblemished history as an investigator and how other public defenders relied on her. So I don't think there's much to, by way of maybe any, whether it's unusual or not. I mean, again, I confess I don't have any trial experience. And as for her, whether or not an investigator, an unlicensed who's not an attorney, a lay person is still a lay person. Maybe she doesn't have knowledge of how the arguments themselves work. And I don't think she actually elicited. McBride testified that she complimented or something to that effect. She complimented the argument and that's all she did. And then without prompting, Campbell's the one that said, oh, I taught her everything she knows. I helped her write it. So I don't think McBride, it's not she asked this loaded question and leading question specifically designed to elicit that answer from Campbell. That's just the way Campbell answered McBride's remark about being impressed by Foster's argument. All right. Thank you, counsel. Thank you, your honors. Mr. McNeil. May it please the court, counsel. As for the statement that Campbell told McBride, McBride alleged that it had something to do with, I helped her write it and I taught her everything she knows. Campbell stated that the statement was more sarcasm or joke, or that's what I get for teaching Foster so well, or that's what I get for having her as my mentee, something like that. So there is no clear cut allegation that she even stated anything about helping her write it. And we have to remember this is after a third stage post-conviction proceeding, which means the standard of reviews manifest error now because the trial court proceeded over an evidentiary hearing and was fact finder and in a much better position to evaluate the credibility and demeanor of all the testifying witnesses. Campbell and Foster testified that this didn't happen. I mean, the analysis could end there. This was not manifest error for the court to simply believe Campbell and Foster's testimony and reject and place little weight and little credibility on McBride's testimony. The cold record is all we have to deal with now, but I would submit that Campbell's and Foster's testimony read more logical and credible than McBride's does, even on the cold record. Both Campbell and Foster testified, of course, she had no input in drafting Foster's rebuttal argument. Foster testified she wasn't even assigned the rebuttal argument until the morning she gave it and wouldn't have had an opportunity to even talk with Campbell, let alone have Campbell's sister in drafting it. And Foster testified that she presuming the trial experience on the panel here, which like Mr. Gonzalez, I don't have experience in that as well, but it sounds pretty common that rebuttal arguments are not written like that. It's also worth noting, even with just this cold record, McBride's story was simply not believable. Counsel characterized her allegations as consistent and adamant, but that's since 2014, three years later. And after that, of course, she had every motive to lie. She believed she was wrongly terminated from the public defender's office due to this case, and even had an active lawsuit regarding this case. But the, I mean, that by definition means that she told people about the statement before those things happened. She wouldn't have had that motivation to make it up before. True. But I think if we look at her testimony and her allegations compared to Barnes' affidavit, it's clear to me that maybe through the years, it changed from a sarcastic or joking remark that Campbell made to her into something more serious. And because Barnes, as the affidavit shows, she never believed Campbell had anything to do with the prosecution. She never believed that Campbell assisted in any way and still didn't believe it. We read between the lines there, the only reasonable inference to make is that McBride, the allegation that fostered, told Barnes was, or that Campbell told McBride, sorry, there's a lot of names here, was characterized as a joke or sarcasm, which was exactly what Campbell herself testified her remark was. She said, I think, quote, well, that's what I get from being such a good teacher or something like that. Again, it has nothing, I don't even know how you can take- Is it her obligation though, not to discount that on her own, not knowing it's truth, but to raise it with the court so that they get to the bottom of it earlier? As you talked about earlier, Justice Doherty, if she believed it was facially untrue, then I don't think that that's just a waste of everyone's time to pursue it as though it was a factual claim, especially if it was characterized as, well, that's what I get for being such a good teacher. I don't think that you can construe that anyway into saying, oh, this is improper assistance in helping her draft her rebuttal argument or anything like that. And the trial court made these same credibility determinations and found, as a matter of fact, that there was no actual conflict of interest as to Barnes. These were not manifestly erroneous decisions. We can't simply make the opposite credibility findings based on the cold record on review simply because the defendant didn't like the credibility findings that the trial court made at this evidentiary hearing. That's not the way it works at the third stage. As for the defendant's citation in the brief to this court's previous opinion in this case, of course, as Justice Doherty pointed out, that was after second stage proceedings. This court took all of defendant's allegations as true at that point, and the standard of review was de novo. Now, after an evidentiary hearing, we have the full story, and of course, this court should put great weight on the trial court's credibility findings at that hearing. Specifically, this court was concerned that Campbell possibly had a supervisory role in defendant's defense. I think the lead has been buried here. Campbell specifically testified that she assigned someone else from the public defender's office to supervise this case, so that eliminates even the appearance of impropriety here. Presumably, she did say because she was a public, or she was a ASA at that point, or at some point when defendant was charged or something, but her reasoning, no matter what, maybe she was close friends with Foster outside of the legal realm, and there's no law against that. Well, we'll certainly never know whether that would have been a reason for her to recuse or wall herself off from the case. We don't have any evidence to suggest that's the reason she did it, but we do know that it was done, so I'm not sure it matters the reason after it's done. Precisely, and I would just stress that this is, again, third stage review, so manifest error is the standard, and the trial court's credibility findings here were not manifestly erroneous, and its ultimate decision that there was no per se or actual conflict were clearly not to affirm. Unless my colleagues have any other questions, I'll return it to Mr. Gonzalez. Thank you. Just a couple of really great points. First one is the counsel for the appellee took issue with the fact that McBride didn't report this until 2014, but I mean, first of all, it wasn't her duty, it was Barnes's duty to bring this to the court's attention before the post-trial stage, as this court found in its previous ruling, and again, you know, counsel talks about, well, now we're at a different stage, now we're after stage three, and now back to the actual conflict, nothing has changed. Nothing has changed. This court previously found that the actual conflict on the part of Barnes stemmed from the fact that she heard this remark and simply didn't report it. It wasn't for Barnes to decide on her own whether or not it was true. The way the actual conflict manifested and the decision-making that's directly attributable to the actual conflict was her making the decision on her own that she just wasn't going to report it. What does the evidence say? Because I know McBride's words changed a little bit, which is not surprising or nefarious, but they changed a little bit over time. What do we know about exactly what she told Barnes? Okay, from my reading of the affidavits, and you're right, I don't think any change was, I thought it was really not much noteworthy at all. At the end of the day, what she consistently said since 2014, again, this first affidavit wasn't prepared by her. It was prepared by Chief Justice at the time, Justice Robb, who was, by the way, the same judge who appointed Campbell to her position. Something to the effect that even Barnes said this in her affidavit, something to the effect that she helped, Campbell helped Foster write the argument. There wasn't much variation beyond that. The substance of what McBride heard, and again, her account has been consistent from her 2014 affidavit to 2017, that she, this is a remark she heard Campbell say, she admitted helping her write the closing argument. And so that's the evidence there. And yes, Boswell certainly concedes that as a general matter. The court's findings at this stage, the post-conviction court is entitled to deference as far as the rulings that it makes to the conflicting testimony. However, that's not like it's an absolute rubber stamp type of thing where one witness is giving, first of all, McBride's account, it's not like it's inherently improbable or preposterous. Right. But counsel, it's based on one statement that Campbell made to her that even without hearing any of the other testimony, you can look at it and say, well, wait a minute, how can that be? You helped write a statement that wasn't written and you helped somebody do it, even though they didn't know until this morning, they were giving that argument and they didn't see you between those two times. Even without hearing any other testimony, we know about the improbability of it. And the testimony just seems to confirm that it didn't happen that way. Okay. And even if it didn't, even if it didn't, what remains at the end of the day is still the actual conflict and the evidence of that and how that remained unchanged, even after the evidentiary hearing. Okay. What about Barnes's representation of the defendant, do you believe was affected by that conflict? Okay. Two answers. The case was kind of over, right? Okay. But again, two answers to that. One is that it's not relevant to her duty to report any actual conflict and her decision-making not to bring this to the court's attention. Right. I know, but that becomes circular. We're only talking about the conversation. I'm asking about what else reflects that Barnes labored under some conflict. What was compromised in her representation of the defendant? Because I think only sentencing was involved at that point. Yeah. We were at the post-trial stage. True. Yeah. So my answer, because my direct answer would be her proceeding on the post-trial motion and not seeking a new trial on behalf of Boswell by raising this ground and at least litigating this issue. So yeah, I would concede that there's nothing apparent from the trial proceedings that I could tell was compromised in any way. And so we kind of know now it's a dead end. It didn't happen the way that McBride thought it happened. We know McBride's interpretation of the remark is too literal. But it's not a dead end if the duty to report as it relates to the actual conflict. You can finish your answer. I don't think that changes. And then just real quickly, I know I'm out of time, but the per se conflict based on the contemporaneous association through the election assistance and all of that, if a per se conflict is established, then none of that other stuff matters. That's per se in Campbell. That's per se through. Correct. Correct. Correct. If there are any other questions. Thank you, counsel. We will take the matter under advisement and the court will now stand in recess.